Devin D. Huseby, OSB #083670
Assistant Federal Public Defender
15 Newtown Street
Medford, Oregon  97501
(541) 776-3630 Telephone
(541) 776-3624 Facsimile
Devin_Huseby@fd.org

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:20-cr-00260-AA-2 |
| Plaintiff, | |
| v. | DEFENDANT'S SENTENCING MEMORANDUM |
| JULIUS DIABLO FRANKLIN, | |
| Defendant | October 19, 2021 10:00 a.m. |

Julius Franklin faces sentencing for Conspiracy to Interfere with Commerce by Robbery and Possession of a Firearm in Furtherance of a Drug Trafficking Crime after being lured to Oregon by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in a reverse-sting stash house robbery investigation. A variety of factors, including Mr. Franklin's unique history and characteristics,

extraordinary conduct while incarcerated, the harshness of pandemic incarceration, and the nature and circumstances of this offense, support the conclusion that  sixty months is "sufficient, but not greater than necessary" to serve the goals of sentencing outlined in 18 U.S.C. § 3553(a).

### Advisory Sentencing Guidelines Analysis

The advisory sentencing guidelines analysis contained in the Presentence Report (PSR) is largely correct except for a recommended two level increase for Mr. Franklin's alleged leadership role under U.S.S.G. § 3B1.1(c). The base offense level is 20.  U.S.S.G. § 2K2.1(a)(4)(B)(i)(I) and (ii).  There is a 1-level increase because taking a controlled substance was the object of the offense. U.S.S.G. § 2B3.1(b)(6). There is a three-level decrease as the offense in this case was a conspiracy that could not be completed. U.S.S.G. § 2X1.1(b)(2). Mr. Franklin receives a three-level decrease for acceptance of responsibility.  U.S.S.G. § 3E1.1(a) and (b). It is worth noting that in this nine-defendant case, Mr. Franklin is the only defendant who has pleaded guilty thus far.  This results in a total offense level of 15. Mr. Franklin is in criminal history category II based on three criminal history points.  This results in an advisory sentencing guideline range of 21-27 months.

The PSR recommends a two-level increase pursuant to U.S.S.G. § 3B1.1(c) for total offense level of 17. Our objection to this enhancement is detailed below Under the PSR's calculation, the guideline range is 27-33 months. The PSR writer is recommending a sentence of 21 months based on a variance.

Regardless of which guideline the Court adopts, there is a mandatory 60 months of incarceration for the use of a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c) that must be imposed consecutively to any sentence imposed for the robbery conspiracy. As discussed below, this 60 month sentence is sufficient on its own.

**Sentencing Factors in 18 U.S.C. § 3553(a).**

Under 18 U.S.C. § 3553(a), the Court is directed to impose a sentence sufficient, but not greater than necessary to comply with the goals of sentencing identified by Congress, In particular, the Court is directed to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the goals of sentencing: punishment, deterrence, protection of the public, and rehabilitation of the defendant; (3) the kind of sentences available; (4) the recommended sentence under the sentencing guidelines; (5) any pertinent

U.S.S.C. policy statements; (6) the need to avoid unwarranted disparities among similar defendants; and (7) the need to provide restitution to victims.

### (1) Mr. Franklin's History and Characteristics and the Circumstances of the Offense

#### a. Mr. Franklin's History and Characteristics

Mr. Franklin is a 42-year-old black man who had an extraordinarily difficult upbringing. Despite that upbringing and some early criminal history, until the instant offense, Mr. Franklin had turned his life around and in recent years had been doing well working for his sister's moving company.

Mr. Franklin was born in San Francisco and grew up in a home where both of his parents were alcoholics and drug addicts. PSR at ¶ 63. His father abused the other members of the family with his mother and older brother receiving the brunt of the abuse. *Id*. However, Mr. Franklin was not spared and could be beaten for things as trivial as struggling to tie his shoes. *Id*. In 1986, the family fled Mr. Franklin's father and moved to Los Angeles. *Id*. at ¶ 64. His mother's substance abuse continued and she sold the family's food stamps for drug money leaving the children without sufficient food or clothing. *Id*. By the age of 16, Mr. Franklin had dropped out of school and was fending for himself by stealing. *Id*. However,

remarkably, Mr. Franklin eventually turned things around for himself and his last

criminal conviction, prior to the instant offense, occurred when Mr. Franklin was

26 years old. *Id*. at ¶ 55.  Since his release from federal custody in 2013, he has had

no criminal convictions until now. At the time of his arrest, he was living with his

two sisters and his disabled brother for whom he was a caretaker. *Id*. at ¶ 62, 67.

He maintains a good relationship with his adult son whose music career he has

been involved in as well has his ex-common law wife. At the time of his arrest, he

was working for his sister's moving company. However, with the beginning of the

COVID-19 pandemic, the moving company's business came to a halt. In June of

2020, Mr. Franklin agreed to participate in the robbery instigated by the ATF.

### b. The Nature and Circumstances of the Offense and Mr. Franklin's Role in the Offense

The government indicted nine individuals with respect to stash house

robberies that co-defendant Shannon Harrop organized.  The first four counts of

the Indictment all relate to an actual armed home-invasion robbery with real drugs

and real victims.  Indictment [47] at 1-3.  Counts five through eight pertain to a

fictitious stash house robbery invented and orchestrated by the ATF.  *Id*. at 3-6.  In

this fake robbery, the defendants were lured by the ATF to rob a stash house of

Page 5  DEFENDANT'S SENTENCING MEMORANDUM

700-800 pounds of premium indoor marijuana with a value of $2,700.00 per pound making the total value of the marijuana around $2 million. Compl. [1] at ¶¶ 24 and 38. The stash house and the marijuana were both entirely fictitious. However, given the quantity and quality of the marijuana, it was a very tempting robbery. Additionally, the agents emphasized that the stash house would be lightly guarded making the robbery not overly dangerous, but one that would still require the use of firearms. As such, the black defendants brought two handguns. In the most recent edition of the New Yorker, there is an article decrying the use of reverse-sting stash house robberies noting that, "[d]esperate people will often take the chance to change their circumstances, even by dangerous, illegal means. You give anyone an opportunity to see millions of dollars when they never had hundreds . . . they'll risk their life for it." Rachel Poser, *Stash-House Stings Carry Real Penalties for Fake Crimes*, The New Yorker, Oct. 11, 2021, available at https://www.newyorker.com/magazine/2021/10/18/stash-house-stings-carry-real-penalties-for-fake-crimes (internal quotation omitted).

Mr. Franklin and the other four Black defendants were charged solely in relation to the fictitious stash house. Mr. Franklin has pleaded guilty to counts five

and seven of the Indictment for Conspiracy to Interfere with Commerce by Robbery under 18 U.S.C. § 1951 and Possession of a Firearm in Furtherance of a Drug Trafficking Crime under 18 U.S.C. §924(c)(1)(A).

These fictitious stash house robberies are widely criticized by the courts as "disreputable" governmental operations that disproportionately punish people of color. *United States v. Conley*, 875 F.3d 391, 402–03 (7th Cir. 2017)(quoting *United States v. Mayfield*, 771 F.3d 417 (7th Cir. 2014)). In *Conley,* the Seventh Circuit gathered cases and discussed the judicial criticism of these operations:

> The district court's discomfort with this case echoes a substantial body of criticism of similar stash house cases both from this circuit and others. Beginning many years ago, we criticized these cases as "tawdry," noting in particular how these operations are "directed at unsophisticated, and perhaps desperate defendants" like Conley who easily take the all-too-tempting bait put out for them by the government. *See United States v. Lewis*, 641 F.3d 773, 777 (7th Cir. 2011). *See also United States v. Kindle*, 698 F.3d 401, 414 (7th Cir. 2012) (Posner, J., dissenting), *reh'g en banc granted, opinion vacated* (Jan. 16, 2013), *on reh'g en banc sub nom. United States v. Mayfield*, 771 F.3d 417 (7th Cir. 2014) (noting that fictitious stash house stings "are a disreputable tactic," and allow law enforcement to manipulate the inducements and temptations to "jack up" sentences); *United States v. Flowers*, No. 15-3988, —— Fed.Appx. ——, ——, 2017 WL 4785960, at *15 (6th Cir. Oct. 24, 2017) (Stranch, J., *concurring*) ("I find the concept of these 'stash house sting' operations at odds with the pride we take in presenting American criminal justice as a system that treats defendants fairly and equally under the law."); *United States v.*

*Washington*, 869 F.3d 193, 213 (3d Cir. 2017) (reminding the government that the court has expressed misgivings in the past about the wisdom and viability of reverse stash house stings.); *Id.* at 223 (McKee, J., *dissenting*) ("the potential for abuse and mischief that is endemic to fictitious stash house stings should not be ignored," and includes government manipulation of drug quantities to increase sentences, difficult questions about whether a planned stash house robbery is within a defendant's actual ambition and means, and whether such cases raise issues of racial profiling); *United States v. Briggs*, 623 F.3d 724, 729–30 (9th Cir. 2010) (expressing concern about the fact that in fictitious stash house operations like the one at issue here, the government has virtually unfettered ability to inflate the amount of drugs and minimize the obstacles thereby increasing sentences); *United States v. Black*, 750 F.3d 1053, 1057–58 (9th Cir. 2014) (Reinhardt, J., dissenting from denial of rehearing en banc) ("in this era of mass incarceration, in which we already lock up more of our population than any other nation on Earth, it is especially curious that the government feels compelled to invent fake crimes and imprison people for long periods of time for agreeing to participate in them . . .

*Id.* at 402-403; *see also United States v. Black*, 733 F.3d 294, 318 (9th Cir. 2013)(Noonan, J., dissenting) ("The power exercised by the government is not only to orchestrate the crime but to control and expand those guilty of it. I do not see how this power can be rationally exercised. . . Massively involved in the manufacture of the crime, the ATF's actions constitute conduct disgraceful to the federal government.").

Page 8  DEFENDANT'S SENTENCING MEMORANDUM

"An unofficial review by *USA TODAY* of court files from across the country revealed that approximately 90% of the individuals currently imprisoned as a result of an ATF stash house sting are either African-American or Hispanic." Marc D. Esterow, *Lead Us Not into Temptation: Stash House Stings and the Outrageous Government Conduct Defense*, 8 Drexel L. Rev. Online 1, 31 (2016). Jeffrey Fagan, an expert in policing analyzed "data on stash-house targets in Chicago between 2006 and 2013. Fagan found that, of ninety-four defendants in twenty-four stings, seventy-four were Black and eight were white—a gap so wide that there was 'a zero-per-cent likelihood' it was accidental." Poser, *Stash-House Stings Carry Real Penalties for Fake Crimes*, available at https://www.newyorker.com/magazine/2021/10/18/stash-house-stings-carry-real-penalties-for-fake-crimes. "There is no legitimate dispute that these stings primarily affect people of color, but the government has steadfastly resisted any defense attempt to determine whether enforcement is racially biased." *United States v. Sellers*, 906 F.3d 848, 857 (9th Cir. 2018) (Nguyen, J. *concurring*). Agent Carr, the lead undercover in this case, testified in a prior case that "more than 55 of the approximately 60 individuals who have been indicted in his stash house reverse-

sting operations are people of color." *Id.* at 851. These figures are not the result of random unbiased policing but stem from the systemic racism that plagues the criminal justice system.

As the Court imposes sentence in this case, the type of investigation and the racial overtones that plague them should be considered. Additionally, as discussed below, it is inappropriate to apply a sentencing enhancement for Mr. Franklin's alleged leadership role based on his agreement to participate in the ATF's script.

The PSR identifies Mr. Franklin as a leader, manager, or supervisor of the instant offense and therefore recommends a two-level increase under USSG § 3B1.1(c). PSR at ¶ 40. The role "adjustment is included primarily because of concerns about relative responsibility.  However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate." USSG § 3B1.1 Application Note Background.

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning

or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Application Note 4.

Mr. Franklin has been identified as a leader based on a number of factors. First, he is identified as a leader because he was identified by Mr. Harrop as a "main chef" and because Mr. Harrop said Mr. Franklin "and his crew are beasts bro."[1] Mr. Harrop's statements regarding Mr. Franklin prior to Mr. Franklin meeting with the undercover agents do not establish his role in this offense.

Second, the PSR identifies Mr. Franklin as a leader because he was present at the second meeting with undercover agents during which the robbery was planned. PSR at ¶ 40. As a preliminary matter, it is a misnomer to call this the "second meeting." Prior to the "first meeting" there were an unknown number of meetings held without the defendants during which the actual operation was planned. Thereafter, "[a]lthough [the defendants'] actions clearly corroborate the

---

[1] This second quote comes from an aborted Medford Police Department investigation. We strenuously object to any consideration of this statement as the government has steadfastly refused to turn over police reports related to this investigation. Mot. Compel [192] at 9. It violates every tenet of due process for these alleged statements to be used against Mr. Franklin when the government will not allow the defense to test that evidence.

Page 11  DEFENDANT'S SENTENCING MEMORANDUM

defendants' intent to carry out an armed robbery, defendants were responding to the government's script." *United States v. Black*, 733 F.3d 294, 303 (9th Cir. 2013). At that "second meeting," Mr. Franklin agreed to the plan that was created by Mr. Harrop and the undercover agents, but he did not come up with the plan or modify it in any significant way. Mr. Franklin's role in that meeting was, on the whole, minimal. Mr. Franklin added comments like: "That's the most important part, is safety first" and "No no, my whole thing is, not to cut you off, but my whole thing is, again, we back to safety first." HARROP_0000462; HARROP_0000463.

Third, the PSR suggests Mr. Franklin qualifies for the enhancement because he "agreed to the split of the robbery proceeds." PSR at ¶ 40. As a primary matter, the question is not whether a person agrees to the split of the robbery proceeds (presumably everybody who conspires to commit a robbery agrees to some cut of the proceeds) but whether they have claimed a right to a larger share of the proceeds. In this case, there is no evidence that Mr. Franklin was to receive a larger share of the proceeds than other defendants.[2] It is just the opposite. As noted in

---

[2] Counsel feels compelled to comment on how Orwellian it is to be arguing about Mr. Franklin's share of the proceeds from a fictitious robbery of fictitious marijuana contained in a fictitious stash house. In reality, his share from that robbery was the same as everybody else's share: nothing but a prison sentence.

paragraph 25 of the PSR, 50% of the proceeds were for the two undercover agents and Mr. Harrop, while the remaining 50% was for the remaining five defendants. As such, Mr. Franklin was on the side of the split that was to be shared amongst the greater number of individuals.

Lastly, the draft PSR identifies Mr. Franklin as a recruiter. The only evidence of this are Mr. Harrop's statements suggesting Mr. Franklin brought additional individuals into the conspiracy. This evidence is not sufficient to establish that role. Second, even if Mr. Franklin did recruit some of the additional individuals not present at the "second meeting," it is worth noting the context in which this alleged recruitment took place. The ATF hatched the plan and then recruited Mr. Harrop to participate. Mr. Harrop then met with the ATF and recruited Mr. Franklin and Mr. Moore. The plan created by the government required additional participants due to the quantity of fictitious marijuana. "The power exercised by the government is not only to orchestrate the crime but to control and expand those guilty of it. I do not see how this power can be rationally exercised." *United States v. Black*, 733 F.3d at 318. As noted by a policing expert in the recent New Yorker article, "[u]ndercover agents also implicitly encouraged Black stash-house

Page 13  DEFENDANT'S SENTENCING MEMORANDUM

targets to recruit other Black men to help them." Poser, *Stash-House Stings Carry Real Penalties for Fake Crimes*, available at https://www.newyorker.com/magazine/2021/10/18/stash-house-stings-carry-real-penalties-for-fake-crimes.

If Mr. Franklin played his role in the ATF's script and recruited additional participants (as the third level recruiter), he should not receive a sentencing enhancement for it. Such an enhancement is devoid of justice. The question of whether a person should receive a sentencing enhancement is not whether they have satisfied one of the factors identified in Application Note 4, but rather we must "weigh all factors in the context of the overarching question: whether [Mr. Franklin] had 'control, organization, and responsibility for the actions of other individuals.'" *United States v. Zarate-Suarez*, 823 F. App'x 665, 674 (10th Cir. 2020)(citation omitted); *United States v. Sevillano*, 967 F.2d 595 (9th Cir. 1992). Given the totality of the circumstances, Mr. Franklin was not a leader and is undeserving of a sentencing enhancement.

d.    **Mr. Franklin's Exemplary Post-Offense Conduct**

Page 14  DEFENDANT'S SENTENCING MEMORANDUM

Mr. Franklin has now been in custody at the Jackson County Jail for 15 months of pandemic incarceration. Despite non-existent programming opportunities, Mr. Franklin has not let the time pass idly. Instead, he has been focused on improving himself and those in his pod. Mr. Franklin, who wishes to become a personal trainer after completing his sentence, has been training himself and helping others improve their fitness. It is truly extraordinary to see such remarkable post-offense rehabilitation from an incarcerated individual. He is respected and appreciated by both jail personnel and fellow inmates.

Deputy Le Bel, writes that he has "observed Mr. Franklin help and influence other [Adults in Custody] in his pod to work out and eat right with what is at hand to them. I have directed new AIC's or AIC's with health issues to talk with Mr. Franklin about how to better themselves." Ex. 2. Deputy Mathews notes that "Julius Franklin is an AIC who never causes any issues. I have moved young AIC's into his cell block and have taken Franklin aside to ask him to watch over without hesitation he takes responsibility. . . I feel Franklin teaches and helps the fellow AIC's in his block with workouts and eating." Ex. 3. Deputy Novak writes that:

> I cannot say enough about how much of a positive influence Mr.
> Franklin has been while confined in our facility. The housing unit that

Page 15  DEFENDANT'S SENTENCING MEMORANDUM

Mr. Franklin has been held in since he came to the jail has become one of the most respectful and well-behaved units in our facility, thanks in a big part to [] Mr. Franklin. He helps all of the AIC's (Adults in Custody) he is housed with to utilize the time they spend here in a productive way, by exercising regularly and working towards bettering their lives when and if they are released from jail or prison. Mr. Franklin is one of the most humble, well-spoken and intelligent AIC's I have been in contact with since I have been a deputy here. It is very rare to see a person while in custody take accountability for their actions, but Mr. Franklin appears to be the type of person that faces things head on. I believe that given the opportunity Mr. Franklin can and will be a productive member of society. Mr. Franklin knows that he is going to be held accountable for his actions, but nothing seems to get him down and he has a great outlook on life. I wish nothing but the best for Mr. Franklin, and hope the path that he takes leads him to a happy and fulfilled life.

Ex. 1.

Fellow inmates have been has appreciative as corrections personnel. Fellow inmate, Jorge Malfavon writes that:

In pod 222, he's been a positive role model for me. Some one I look up to, very caring for peoples needs. For example when I was here in the beginning I saw him work out everyday! Pushing people to stick to there commitment of thinking positive and making them feel good about themselves, so I asked him for help and he makd me work out and pushed me when I didn't feel like it! So because of him I've never been in better shape in my life and my self-esteem is higher.

Ex. 5

Fellow inmate Nicholas Elliott writes that:

Page 16  DEFENDANT'S SENTENCING MEMORANDUM

Mr. Franklin is a man of absolute & strict accountability, & that not only applies to his current predicament, it's a level that's maintained, throughout his daily living, literally in everything that he does for himself & his genuine interactions, & true care & concerns for other individuals. Even when being in the face of adversity, Mr. Franklin has an adept ability to promote positivity & to alleviate the stresses that we face while being incarcerated. Personally speaking, I admire Mr. Franklin, in many aspects he's truly honorable & honest man . . . he's constantly helping individuals to become the best versions of themselves whether it be through fitness, conversation, or simply leading by example.

Ex. 4.

The Supreme Court has held that post-offense rehabilitation may be "highly relevant" to several of the §3553(a) factors.

[E]vidence of postsentencing rehabilitation may plainly be relevant to "the history and characteristics of the defendant." §3553(a)(1). Such evidence may also be pertinent to "the need for the sentence imposed" to serve the general purposes of sentencing set forth in §3553(a)(2) - in particular, to "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training . . or other correctional treatment in the most effective manner." §§ 3551(a)(2)(B)-(D); See [United States v.] McMannus, 496 F. 3d. at 853 (Melloy, J., concurring) ("In assessing . . . deterrence, protection of the public, and rehabilitation, 18 U.S.C. § 3553(a)(2)(B)(C) & (D), there would seem to be no better evidence than a defendant's post incarceration conduct."). Postsentencing rehabilitation may also critically inform a sentencing judge's duty under § 3553(a) to "impose a sentence sufficient, but not greater than necessary" to comply with the sentencing purposes set forth in §3553(a)(2).

*Pepper v. United States*, 562 U.S. 476, 491 (2011). Although typically such post-offense rehabilitation takes place out of custody, Mr. Franklin's post-offense conduct in custody has been nothing short of remarkable.

### (2) The Goals of Sentencing

In this case, the goals of sentencing are adequately served with a 60-month sentence, which will hold Mr. Franklin accountable for his role in the conspiracy. Mr. Franklin has already served fifteen months of pandemic incarceration: enduring lockdowns, lack of access to family, and the stress and anxiety that accompany fear of illness and harsh conditions of confinement. When he is designated to a federal prison, it is unlikely that conditions will improve in the near term as federal prisons have turned into charnel houses with inmates routinely placed on 23 hour lockdowns. Mr. Franklin wishes to become a personal trainer and it is unlikely federal prison will offer him any ability to realize that dream. He and society would be better served with Mr. Franklin under community supervision while he works towards his goals. The Court is required to impose a 60 month sentence and should not impose anymore as it would be unduly punitive while offering no rehabilitative benefits.

Page 18  DEFENDANT'S SENTENCING MEMORANDUM

### (3) The Kind of Sentences Available

Although the Court is required to impose a 60 month sentence for the 924(c) consecutive to any sentence imposed for the Hobbs Act Robbery conspiracy, the court is not supposed to determine an appropriate sentence for the Hobbs Act Robbery and then impose an additional 60 months. Rather, under § 3553(a) and the parsimony principle, the Court is instructed "to impose a sentence sufficient, but not greater than necessary." "The § 3553(a) factors are used to set both the length of separate prison terms and an aggregate prison term comprising separate sentences for multiple counts of conviction." *Dean v. United States,* 137 S. Ct. 1170, 1176 (2017). The Court should therefore "consider sentences imposed on" the 924(c) when imposing a sentence for the Robbery. Under the totality of the circumstances, 60 months in total is sufficient.

### (4) The Recommended Sentence Under the Sentencing Guidelines is Too Harsh

The guideline sentence for the Robbery, of 21 months, is by itself reasonable. However, when considered in combination with a consecutive sentence of 60 months is far too long. Combining these two sentences for a total of 81 months results in a sentence that does not account for the severity or circumstances of the

Page 19  DEFENDANT'S SENTENCING MEMORANDUM

crime, the harshness of pandemic incarceration, or any other factor relevant to sentencing in this case.

With respect to the 924(c) in this case, it is worth noting that under the circumstances of this case, the mandatory 60 months is unusually harsh. Mr. Franklin will receive 60 months for use of a firearm in furtherance of a drug trafficking crime. The ATF set up an extremely enticing robbery during which firearms were necessary. Mr. Franklin did not supply those firearms (they arrived in a car different from the one Mr. Franklin arrived in) and he would not have carried either of the two firearms during the robbery. Additionally, the drugs were entirely fictitious. None of these factors are accounted for in the mandatory sentence. This is not a typical 924(c) and 60 months is too harsh.[3]  However, the Court cannot reduce this sentence. However, as discussed above, it can account for the harshness of this sentence by declining to impose a custodial sentence for the robbery count and instead considering the totality of the circumstances.

---

[3] The 924(c) sentencing scheme is rigid and does not account for relative responsibility or the fact that this was a reverse sting. For instance, there are no downward adjustments based on specific offense characteristics like U.S.S.G. § 2X1.1(b)(2).

Page 20  DEFENDANT'S SENTENCING MEMORANDUM

### (5) The Court Should Avoid Unwarranted Disparities Between Mr. Franklin and the White Defendants and Uncharged White Conspirators

Although there is only so much the Court can do in this case to avoid disparities in how Mr. Franklin is treated in relation to the white defendants and uncharged white conspirators, it should account for those disparities in sentencing Mr. Franklin. As set forth in the Motion to Compel [192], there are at least four white individuals who participated in actual armed home invasion robberies who are not facing charges. The CI is a white man who participated in one or more robberies and appears to not be facing any charges. Brent Adam Philip does not appear to have been targeted despite admitting to the CI that he had participated in a robbery orchestrated by Mr. Harrop. Nima Blue was implicated in numerous robberies by co-conspirator statements, Uhaul records, photographs of him purchasing supplies for a robbery, and witness statements.[4] Kenan Dizdarevic, another white individual, is implicated in one or more robberies with DNA, co-conspirator statements, and fingerprint evidence.

Additionally, although co-defendant Michael Manring is charged with an actual armed home invasion robbery during which firearms were brandished, and

---

[4] The government relays that Mr. Blue is now deceased.

based on discovery appears to have been involved in at least one additional uncharged armed home invasion robbery, he has not been charged with a 924(c) when all five Black defendants have been so charged despite the fact that there were only two firearms and no drugs. It is almost certain that absent a 924(c), Mr. Manring's guidelines will come out under 60 months.

Although this Court cannot change who has been charged in this case or add charges for Mr. Manring, it can mitigate the disparities by sentencing Mr. Franklin to 60 months.

**Conclusion**

For the foregoing reasons, we respectfully submit that a sentence of sixty months in total is "sufficient, but not greater than necessary to further the goals of sentencing as set forth in 18 U.S.C. § 3553(a).

Respectfully submitted this _____ day of October, 2021.

/s/ *Devin D. Huseby*
Devin D. Huseby
Assistant Federal Public Defender

Dear Mr. Huseby,

My Name is Logan Novak, I am currently employed as a deputy at the Jackson County Jail.  I am writing a reference letter regarding Julius Franklin's behavior while in the Jackson County jail. I cannot say enough about how much of a positive influence Mr. Franklin has been while confined in our facility. The housing unit that Mr. Franklin has been held in since he came to the jail has become one of the most respectful and well-behaved units in our facility, thanks in a big part to of Mr. Franklin. He helps all of the AIC's (Adults in Custody) he is housed with to utilize the time they spend here in a productive way, by exercising regularly and working towards bettering their lives when and if they are released from jail or prison. Mr. Franklin is one of the most humble, well-spoken and intelligent AIC's I have been in contact with since I have been a deputy here. It is very rare to see a person while in custody take accountability for their actions, but Mr. Franklin appears to be the type of person that faces things head on. I believe that given the opportunity Mr. Franklin can and will be a productive member of society. Mr. Franklin knows that he is going to be held accountable for his actions, but nothing seems to get him down and he has a great outlook on life. I wish nothing but the best for Mr. Franklin, and hope the path that he takes leads him to a happy and fulfilled life.

Deputy Novak - JCSO

**From:**       Devin Huseby
**To:**         Viktor Vodak
**Subject:**    Fwd: Julius Franklin
**Date:**       Saturday, September 25, 2021 7:45:51 AM

---

Get Outlook for iOS

---

**From:** Robert Le Bel <LeBelRJ@jacksoncounty.org>
**Sent:** Friday, September 24, 2021 10:31:01 PM
**To:** 'Devin Huseby' <Devin_Huseby@fd.org>
**Subject:** RE: Julius Franklin

Hello Sir.

I am not sure exactly what you are looking for.

Mr. Franklin, Julius arrived at our facility in July of 2020. Mr. Franklin has been very respectful to our staff, both sworn and civilian. Mr. Franklin has only been written up once and placed on discipline for a short time. The discipline was for finding another AIC's (adults in custody)  medication in his cell. I have observed Mr. Franklin help and influence other AIC's in his pod to work out and eat right with what is at hand to them. I have directed new AIC's or AIC's with health issues to talk with Mr. Franklin about how to better themselves.  I am a weight lifter myself and Mr. Franklin and I have had a few discussions on exercises and programs. Mr. Franklin knows to keep things professional with me and my coworkers.

I hope this helps.

Sincerely
Deputy Le Bel
Jackson County Sheriff's office
Corrections Division

---

**From:** Chad Mathews
**To:** Devin Huseby
**Subject:** RE: RE: Julius Franklin
**Date:** Thursday, October 14, 2021 10:36:14 AM

Julius Franklin is an AIC who never causes any issues. I have moved young AIC's into his cell block and have taken Franklin aside to ask him to watch over without hesitation he takes responsibility. I would say his cell block is probably the most in shape block, I feel Franklin teaches and helps the fellow AIC's in his block with workouts and eating. Franklin can motivate individuals, and keeps a good vibe in the cell block.

To whom it may concern,

Hello, my name is Nicholas Thomas Elliott, & I'm composing this letter, in regards, to my superior / aquaintance, Mr. Julius Franklin. Honestly when writing about Mr. Franklin, this letter writes itself. Being in the circumstance that we're in, it's extremely difficult, to actually cross paths, with truly kind & genuine individuals. In relation to Mr. Franklin, due to our own decision making, him & I have served a significant amount of time, being incarcerated. As you may know, You don't always meet "choice" people behind these walls, however this definitely isn't the case, when it pertains to Mr. Franklin. Naturally when contained in this environment, personally I'm very reluctant, to personalize myself with anyone, however on the other side of things, I'm also a firm believer, that God places people in your life for a reason, even when in the beginning, we may not know, what that reason may be.

My purest intention is this, it's to provide you with a clearer view, of who Mr. Franklin is as an individual, which is eons beyond, the irrational decisions that he's made, which in turn has created a negative image of Mr. Franklin, on the outsiders perspective. It so easy, for so many of us to pass judgement on an individual, especially when provided with supporting documents, however you'd be astonished, if you truly invested the time, to simply have a conversation, & get to know Mr. Franklin, on a more intimate basis. The majority of individuals, allow themselves to get stuck, when their viewing Mr. Franklin, based off of his criminal history, it's almost as if they've written him off. Allow yourselves to be open, & truly see past the external extremities, & see the depths of Mr. Franklins mind & heart.

Mr. Franklin is a man of absolute & strict accountability, & that not only applies to his current predicament, it's a level that's maintained, throughout his daily living, literally in everything that he does for himself & his genuine interactions, & true care & concern for other individuals. Even when

being in the face of adversity, Mr. Franklin has an adept ability, to promote positivity & to alleviate the stresses, that we face while being incarcerated. Personally speaking, I admire Mr. Franklin, in many aspects, he's truly a honorable & honest man.

Naturally, being graced with Mr. Franklins presence, his aura illuminates pure positivity, even at times, with his quiet demeanor, Mr. Franklin exudes empathy, with the utmost selflessness & stands firm, with his fierce leadership skills. His being has a gravitational pull, & his words are nothing less of uplifting, & he's constantly helping inviduals strive, to become the best version of themselves, whether it be through fitness, conversation, or simply leading by example. There are many variables to Mr. Franklin, however Mr. Franklin isn't a problem that needs to be solved, Mr. Franklin is a man, that constantly evolves.

Even if you're interaction with Mr. Franklin has been brief, his personality alone will leave a memorable mark with you. He's a kind spirited, outgoing, down to earth, & very influential human being. I know for an absolute fact, if given the opportunity, Mr. Franklin would never look twice again, at the life of criminality. It's been an amazing blessing & a wonderful honor, to be around Mr. Franklin, In the midst of all this, I pray that God's grace is shed upon him, & his predicament. All I ask, is to see beyond exterior, & truly look at the interior, with an open heart & open eyes, & I promise you, the rest will speak for itself.

Sincerely,

Nicholas T. Elliott

9-22-2021

To Whom This may Concern,

My Names Jorge Malfavon, (12-22-81) 102015

I'm Writing This letter In Regards to Julius Franklin
Character and my Relationship with him IN Pod
222. He's been a positive role model For me Some
one I look up to, very Caring For Peoples NEEds
For Example when I was hERE In The begining I
Saw him Work out everyday! Pushing People to stick to There
a Commitment of thinking Positive and Making them
feel good about themselves, So I asked him For help
and he made me Work out and Pushed me when I
didn't Feel like it! So because of him I've never
been in better shape In my life and My Self
esteem is higher Including my health I'm a diabetic
and use less Insulin and stopped taking my
depression Pills because of my Friend, Franklin
he allways gives me good advice That it's time
to do right not look at our past of our
wrongs but the Steps to Take To better ourselves
and The people around us because we all make
Mistakes. So For whats it's Worth im Glad
I met Franklin and In my book a Great
Person to Call a Friend and A Good Dude

Thanks

Ex 5 001